IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA SPRADLIN, | ) | CASE NO. 1:25-cv-01612-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff Joshua Spradlin ("Spradlin") seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Spradlin's DIB be affirmed.

## II.     Procedural History

Spradlin protectively filed for DIB on March 21, 2023, alleging a disability onset date of

July 4, 2022. (Tr. 371). The claims were denied initially and on reconsideration. (Tr. 228, 239).

Spradlin then requested a hearing before an ALJ. (Tr. 257-58). Spradlin, represented by counsel,

and a Vocational Expert ("VE") testified before an ALJ on August 28, 2024. (Tr. 182-217). On

September 5, 2024, the ALJ issued a written decision finding Spradlin not disabled. (Tr. 7-29).

The Appeals Council denied his request for review on June 12, 2025, making the hearing

decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

Spradlin timely filed this action on August 4, 2025. (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Spradlin was born October 17, 1986. (Tr. 371). He was 35 years old on his alleged onset date, making him a younger individual according to agency regulations. (Tr. 218). He has at least a high school education. (Tr. 28). He has past relevant work as a department manager DOT 189.167-022, SVP 4, sedentary exertional level, and as a customer service supervisor, DOT 241.137-014, SVP 6, sedentary exertional level. (Tr. 27).

#### B.    Relevant Medical Evidence

An examination note from May 23, 2022 reveals that Spradlin was reporting bilateral ear symptoms over the previous three weeks, including mild to moderate ear pain with ringing sound, dizziness, headaches, and "other strange symptoms like muscle spasms/cramps." (Tr. 1255). Spradlin was assessed with bilateral otalgia. (*Id.*). On May 25, 2022, Spradlin presented at the emergency department ("ED") complaining of a headache that had worsened after he was originally treated with doxycycline and steroids. (Tr. 995). His symptoms included 3/10 pain, associated nausea and intermittent dizziness. (*Id.*). He underwent a head CT that showed no acute intracranial process. (Tr. 630).

Spradlin attended an office visit with Lung Louie, APRN-CNP, of the University Hospital Neurology Department, on June 23, 2022, and reported that he had been having tension headaches a few times monthly and migraines once monthly. (Tr. 649). Over the last month he had also experienced dizziness and ringing in his ears. (*Id.*). Since his ED visit on May 25, 2022, his headache had been constant, and he has experienced a spinning sensation leading to nausea.

2

(*Id.*). He had been having trouble holding his head steady, and noticed the headache exacerbate when talking or tensing up. (*Id.*).

Spradlin returned to the ED on July 5, 2022, presenting with a headache and neck pain for the past several months. (Tr. 644). A cervical CT was performed, revealing only mild spondylotic changes of the cervical spine without canal or foraminal stenosis. (Tr. 635). Spradlin was provided a prescription for tizanidine to help with neck muscle tightness and advised to continue his previously prescribed headache medications. (Tr. 646). He attended an appointment with CNP Louie on July 6, 2022 and reported feeling like "every nerve fires off" whenever he tenses, particularly when he is concentrating. (Tr. 810). He added that his CT scan had indicatd that he has bone spurs that may be contributing to his issues. (*Id.*).

Spradlin underwent a psychiatric diagnostic evaluation with Rebecca S. Luebbe, LPCC, on July 14, 2022. (Tr. 144-46). He reported feelings of severe anxiety that had become debilitating over the last two months. (Tr. 144). He attributed his anxiety to his undiagnosed physical health conditions, and stated that his anxiety symptoms had grown worse when a doctor questioned his physical symptoms. (*Id.*). He believed his anxiety and pain intensified when he was prescribed medications, and he had withdrawn from friendships and felt incapable of managing his symptoms. (*Id.*). LPCC Luebbe diagnosed him with major depressive disorder, single episode, moderate, and generalized anxiety disorder. (*Id.*).

Spradlin continued attending psychotherapy appointments through March 2023, and at these appointments he continued to express feelings of anxiety, most often related to his physical health issues, and uncertainty about his professional and financial futures due to those health concerns. (Tr. 1265, 1268, 1274, 1280, 1289, 1298, 1322, 1328, 1331, 1334, 1340). He

repeatedly noted feeling frustrated, hopeless, and unheard. (Tr. 1268, 1274, 1289, 1328). By March 16, 2023, he claimed he was experiencing multiple daily panic attacks. (Tr. 1334).

On July 15, 2022, Spradlin attended an office visit to establish care with Andrew Bronsky, PA-C. (Tr. 557-59). He reported ongoing neck pain, ringing in his ears worse on the right side, dizzy spells, spasms in his neck and upper back with burning, daily headaches with migraine symptoms, strained vision worse on the left side, and a feeling that his head is "heavy." (Tr. 557). He had tried medications for the headaches, but had experienced significant side effects. (*Id.*). He has also had panic attacks, "electric" feelings in his hands with some sudden movements, and occasional facial spasms. (*Id.*).

An audiogram administered on July 19, 2022 indicated his hearing was within normal limits bilaterally. (Tr. 1168). On July 21, 2022, Spradlin was evaluated for physical therapy, with chief complaints including neck pain, constant headaches, and scapular pain. (Tr. 701). Spradlin reported pain exacerbation when he tenses up, constant ringing in his ears, dizziness, tingling in his hands and legs, and sudden onset of "crazy anxiety." (*Id.*). His pain ranged from 3/10-8/10. (*Id.*).

On August 15, 2022, Spradlin had a virtual medical visit with Josie Znidarsic, D.O., complaining of a rash on his head, and he was diagnosed with herpes zoster. (Tr. 549).

He underwent a cervical MRI on August 16, 2022 that showed mild degenerative changes without any cord compression or cord edema. (Tr. 607). That same day a head MR identified no potential cause of his headaches and was negative for intracranial enhancing mass lesion. (*Id.*). A thoracic spine x-ray performed on September 9, 2022 showed a mild curve of his upper dorsal spine with convexity to the left and mid-dorsal convexity to the right, consistent with rotoscoliosis. (Tr. 613).

At an appointment with his treating PA Andrew Bonsky on September 9, 2022, Spradlin reported that he was still experiencing severe head, neck, and upper back pain despite his work in physical therapy. (Tr. 545). He did have some relief from over-the-counter medications, and he had some improvement with his mobility. (*Id.*). He reported that he was capable of being active for 15 to 20 minutes at a time. (*Id.*).

At a pain management consultation on September 21, 2022, Spradlin was diagnosed with myalgia, with a note that physical deconditioning and depressed mood were also "pertinent to this visit." (Tr. 608). The examination note indicated that there was no identifiable pathological cause for his present pain, and that there is a suspicion that "[w]hile the patient may not be consciously aware of this such as a malingering, this could be similar to a factitious disorder." (*Id.*).

At a September 30, 2022 appointment with PA Bonsky, Spradlin indicated he had cut back on his physical therapy appointments because he was not tolerating them well. (Tr. 543). He was assessed by Augusto Hsia, M.D., his pain management doctor, with chronic pain syndrome and a cervical myofascial strain on October 18, 2022. (Tr. 1157). PA Bonsky assessed him with acute headache, neck pain, and thorcic back pain on November 17, 2022. (Tr. 538).

On November 22, 2022, Spradlin was seen at the Cleveland Clinic Center for General Neurology by Sarah Hrestak, APRN-CNP. (Tr. 920). He was seeking a consultation regarding headaches and neck pain. (*Id.*). The headaches were described as occipital, cervicogenic, temporal and tension, and noted to occur "24/7." (*Id.*). He noted that he continued to have tingling and random pain in his arms and constant neck and shoulder pain. (*Id.*). He was struggling to sit up straight for any length of time, and when he did it led to migraines that brought on dizziness. (*Id.*). He had a constant burning sensation between his shoulder blades, and

5

constant tinnitus, and he would sometimes "throw out" his back or have spasms when he got out of bed. (*Id.*). CNP Hrestak diagnosed Spradlin with neck pain, disturbance of skin sensation, and migraine without aura or status migrainous, not intractable. (*Id.*).

On November 28, 2022, Spradlin saw Mary Patterson, APRN-CNP, from the Cleveland Clinic Center for Comprehensive Pain Recovery – Neurological Institute. (Tr. 1142-47). He complained of constant head pain, reporting intermittent shooting, cramping, spasms and occasional sharp pain in the right greater than the left side of his neck. (Tr.1142). His pain was radiating up into his head and eyes/ears, his trapezius, and his upper back. (*Id.*). He had random sharp, stabbing pain in his right arm greater than his left, and a shooting "arc" like right sided head pain with pressure in his posterior occipital region. (*Id.*). He had intermittent nausea, episodes of dizziness, aura, and sound sensitivity. (*Id.*). His physical exam revealed a normal gait, normal posture and spinal curves, with palpable muscle spasm and/or tenderness bilateral at the occipital, cervical and, thoracic spine. (Tr. 1145). He had decreased flexion, extension, and rotation of the cervical spine, and decreased shoulder range of motion. (*Id.*). His upper extremity muscle strength and tone was within normal limits, his straight leg raise test was normal, and his sensation to light touch was decreased on the right. (*Id.*).

An EMG administered on December 9, 2022 was normal. (Tr. 591). At an appointment with PA Bonsky on December 14, 2022, Spradlin reported he was now able to sit up for two hours before he needed to lay down. (Tr. 536). He declined any medication, but was continuing to use lidocaine, and was considering a recommendation for acupuncture. (*Id.*). He felt he was benefitting from counseling, although he thought he might be slipping back with his anxiety. (*Id.*).

6

Spradlin was assessed for physical therapy on January 12, 2023, and showed signs and symptoms consistent with cervicogenic dizziness, unilateral vestibular hypofunction, and cervical radiculopathy. (Tr. 1213). This was affecting his ability to perform prolonged seated tasks at a desk, drive, or balance. (*Id.*). He required skilled therapy, and his rehabilitation potential and prognosis were good. (*Id.*).

Spradlin presented at the ED on January 23, 2023 with chest pain and dizziness. (Tr. 577). He also reported palpitations that had started abruptly that morning. (*Id.*). An ECG showed sinus tachycardia, while a chest x-ray revealed no acute abnormality. (Tr. 571).

At an office visit with otolaryngology PA-C Rachel Fredericksen on February 14, 2023, Spradlin reported generally experiencing a few minutes of room-tilting that feels like motion sickness leading to nausea lasting for hours. (Tr. 732). He will have multiple episodes as described daily, and also has constant tinnitus and chronic migraines. (*Id.*). Spradlin requested a vestibular battery test, which was completed on March 10, 2023, and was generally normal except for a right sided abnormal ocular vestibular evoked myogenic potentials ("VEMP") that could correlate to headaches of the right frontal region. (Tr. 1127-32).

On March 15, 2023, Spradlin again visited the ED complaining of chest pain. (Tr. 722). He noted that it started shortly after his vestibular battery test. (*Id.*). Diagnostic testing was unrevealing, his chest CT was negative for acute findings, and his EKG was grossly normal. (Tr. 726).

Spradlin was discharged from physical therapy on April 3, 2023, with a diagnosis of cervical radiculopathy, right ear peripheral vertigo, and abnormal posture. (Tr. 566). He had reported being awakened by pain, burning, difficulty falling asleep or finding a comfortable sleep position, diminished motion, dizziness, headaches, stiffness, numbness, constant pain, pain

with work activity, spasms, tingling, and weakness. (*Id.*). He reported his symptoms were currently 2/10 at their best and 3/10 at their worst. (Tr. 567).

On August 4, 2023, Spradlin established care with Bhanu Swamy, M.D., and reported severe migraines, generalized malaise, and ear pain. (Tr. 1493). He also reported dizziness, shoulder and upper back weakness, muscle spasms, cramps, headaches, and palpitations that had led to a diagnosis of sinus tachycardia. (*Id.*). He underwent a Holter Monitor study, and his symptoms correlated overwhelmingly with sinus rhythm, less frequently with sinus rhythm with SVE's and on two occasions, sinus rhythm with very brief runs of non-sustained SVT. (Tr. 1492).

Spradlin had a lumbar x-ray on August 23, 2023 which showed mild degenerative spondylosis of the lower lumbar spine without acute osseous abnormality. (Tr. 1516). He was evaluated for physical therapy on September 8, 2023, noting chronic intermittent lower back and right lower extremity pain. (Tr. 1480). His back pain was aggravated by standing/walking/sitting too long, and he had difficulty with bending and lifting. (*Id.*). He demonstrated pain and increased limitation in lumbar range of motion, with a positive reproduction of pain with straight leg raise and seated slump tests. (Tr. 1483). There was tenderness to palpation to the lumbar spine and right hip musculature. (*Id.*). There was impairment in flexibility, independence in exercise, patient recorded outcome measures, posture, range of motion, strength, and tissue tenderness. (*Id.*).

Spradlin saw his cardiologist, Bret Rogers, M.D., on October 31, 2023. (Tr. 1471-72). Dr. Rogers evaluated him for palpitations, and assessed him with palpitations, short runs of supraventricual tachycardia ("SVT"), and premature atrial contractions ("PAC"). (Tr. 1472). His symptoms were determined to be most consistent with dysautonomia syndrome, such as sinus

tachycardia. (*Id.*). A stress ECG performed on November 30, 2023 was normal except for low heart rate recovery, borderline ST changes, low exercise tolerance, and low chronotropic response index. (Tr. 1504). An ECHO administered that same day was normal. (Tr. 1507-08).

Spradlin was again evaluated for physical therapy on January 26, 2024 with a complaint of generalized back pain with radicular symptoms interfering with standing, walking, bending, lifting, carrying, and grooming. (Tr. 1567). It was noted that he suffers from dysautonomia causing palpitations and tachycardia even at rest without exertion. (*Id.*). He reported pain throughout his entire back, and impairments in balance, coordination, flexibility, gait, joint mobility, posture, range of motion, and strength. (*Id.*).

### C.      Medical Opinion Evidence

#### 1.      State Agency Reviewing Opinion Evidence

On July 18, 2023, state agency reviewing physician Rannie Amiri, M.D., opined that Spradlin was limited to the performance of work at the light exertional level, with the additional limitations to frequent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent crawling; frequent reaching overhead with the right upper extremity; and avoiding all exposure to hazards including unprotected heights, hazardous heavy machinery, and commercial driving. (Tr. 223-24). State agency reviewing physician J.V. Corcoran, M.D., affirmed Dr. Amiri's opinion on January 16, 2024. (Tr. 233-35).

On October 25, 2023, state agency reviewing psychologist Irma Johnston, Psy.D, opined that Spradlin had moderate limitations in the domains of interacting with others and concentrating, persisting, and maintaining pace; mild limitations in the domain of adapting or managing oneself; and no limitation in the domain of understanding, remembering, and carrying out instructions. (Tr. 221). Dr. Johnston further found that Spradlin had moderate limitations in

his ability to carry out detailed instructions; to maintain and concentrate for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (Tr. 225-26). State agency reviewing psychologist Carl Tishler, Ph.D., affirmed Dr. Johnston's opinion on January 17, 2024. (Tr. 232).

### 2.    Consultative Examiner

On September 21, 2023, Natalie Whitlow, Ph.D, conducted a mental health consultative examination of Spradlin. (Tr. 1438-45). Dr. Whitlow diagnosed Spradlin with generalized anxiety disorder with panic features and persistent depressive disorder. (Tr. 1443). Dr. Whitlow opined that that Spradlin did not demonstrate significant, severe, or debilitating limitations in the domains of understanding, remembering, and carrying out instructions; concentrating and maintaining persistence and pace to perform simple and multi-step tasks; and responding appropriately to work pressures in a work setting. (Tr. 1445). She further opined that Spradlin did not appear to have limitations in responding appropriately to supervision and to coworkers in a work setting. (*Id.*).

### 3.    Medical Source Statement

In response to a request for medical information submitted by the insurance company that was reviewing Spradlin's disability claim, PA Bonsky wrote that it was "beyond the scope of my practice to determine long-term disability," and recommended that the insurance company review the specialist consultations. (Tr. 918). PA Bonsky did check "No" in response to the

question of whether Spradlin was capable of performing his work-at-home, full time, sedentary occupation, and wrote that "Joshua declines being able to work." (*Id.*). He further checked "No" in response to the question of whether "there are any accommodations that could be made to allow him to return to his work at home sedentary capacity?" (*Id.*). PA Bronsky also added that "Joshua declines being able to work too much neck and head pain. Neck feels too weak unable to hold head up for longer than one hour." (*Id.*).

### D.       Administrative Hearing Evidence

Spradlin testified before an ALJ on August 28, 2024. (Tr. 189-207). He testified that he was 5'10", about 400 pounds, and that he was single and living alone. (Tr. 189-90). He limits his driving mostly just to doctor appointments or some trips to the store. (Tr. 190). He earned his GED as an adult, and last worked on July 4, 2022, although he received both short-term and long-term disability after that date. (Tr. 191).

Spradlin stated that he was prevented from working by a "collective mix of problems" that included dizziness with migraines, constant muscular and nerve pains in his neck and lower and middle back that preclude him from holding a continuous upright posture, and spasms that cause additional head pain. (Tr. 193). The dizziness makes it hard for him to read, and he is unable to stand for very long. (Tr. 193-94). After about an hour he has to lay down for most of the day. (Tr. 194). He also reports dysautonomia conditions, such as heart palpitations, which have led to emergency room visits, and general anxiety disorder. (*Id.*). He has a difficult time interacting with people. (*Id.*). He either has a tension headache, a migraine, or both, "nearly 24/7." (Tr. 195). His neck and back pain occur daily. (*Id.*). His pain is typically at a 5-6/10 with over-the -counter medication. (Tr. 196). Without those medications it would be 7-8/10. (*Id.*).

11

Spradlin testified that he would be able to sit comfortably in an office chair for about 15 minutes before he would begin to feel symptoms. (Tr. 197). After about an hour he is too symptomatic to concentrate or perform work tasks. (*Id.*). On an average day, Spradlin is able to stand or walk for less than 20 minutes. (*Id.*). He is able to comfortably lift under 30 pounds, indicating he is probably able to lift a case of water, but nothing heavier than that. (*Id.*). He regularly performs self-care such as bathing and brushing his teeth. (Tr. 198). He does not socialize in person, although he does communicate with others by phone and text. (*Id.*). He spends most of his time just laying down, and doing "some social media stuff" to try to stay connected to others. (*Id.*). He sometimes becomes dizzy when looking at his phone or watching television. (*Id.*). Some days all he can do is just listen to music with his eyes closed. (*Id.*). He has a hard time maintaining focus, as he will often start drifting mentally and become distracted by his medical conditions. (Tr. 198-99). He does household chores "on a scattered basis and in little pieces at a time." (Tr. 199). He can typically only perform a chore for about 10 to 20 minutes at a time. (Tr. 199-200).

Spradlin added that his condition has stayed about the same since July 2022, although his heart palpitations are new, and his symptoms were amplified when he was diagnosed with shingles. (Tr. 200). His conditions can be exacerbated by hot weather, by physically straining, or by his anxiety. (Tr. 200-01). He has tried to manage his diet to help improve his symptoms, and he has done exercises he saw on YouTube, although those exercises seemed to make things worse. (Tr. 201). Reaching overhead can sometimes cause him pain, but he can generally do it some days, although not for very long. (Tr. 202).

Under questioning by his attorney, Spradlin testified that he has tinnitus "24/7." (Tr. 203). He believes this to be indicative of damage to his inner ear and vestibular system. (*Id.*). He

also experiences vestibular migraines. (*Id.*). He does find that a small dose of caffeine will help with his migraines, although he is limited in the caffeine he can have due to his heart condition. (Tr. 203-04). He does not believe physical therapy has improved any of his conditions. (Tr. 205).

Once Spradlin's testimony was complete, VE Roxanne Benoit testified. (Tr. 207-15). She identified two prior jobs for Spradlin: department manager, DOT 189.167-022, SVP 7, sedentary exertional level; and customer service supervisor, DOT 241.137-014, SVP 6, although performed at SVP 4, sedentary exertional level. (Tr. 209-10). For his first hypothetical, the ALJ asked the VE to consider an individual of the claimant's age, education, and with the identified past positions, who is limited to work at the light exertional level, except that the individual can frequently reach overhead with the right upper extremity; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. The individual is able to understand, remember, and carry out simple instructions; able to use his judgment to make simple work-related decisions; cannot perform work requiring a specific production rate, i.e., assembly line work; is able to deal with occasional changes in a routine work setting; and able to occasionally interact with supervisors, coworkers, and the public. (Tr. 210-11). VE Benoit testified that this individual would be unable to perform Spradlin's past work, but would be capable of working as a marker, DOT 209.587-034, light, SVP 2, with 68,000 jobs in the national economy; as a cleaner, DOT 323.687-014, light, SVP 2, with 63,000 jobs in the national economy; and as a mail clerk, non-postal, DOT 209.687.026, light, SVP 2, with 36,000 jobs in the national economy. (Tr. 211-12).

For his second hypothetical, the ALJ asked the VE to consider an individual limited to the light exertional level who could occasionally reach overhead with the right and left upper

13

extremity; frequently reach in all other directions with the right and left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; never be exposed to unprotected heights, moving mechanical parts, operate a motor vehicle; has the ability to understand, remember and carry out simple imstructions; able to use his judgment to make simple work-related decisions; cannot perform work requiring specific production rate, i.e., assembly line work; able to deal with occasional changes in a routine work setting; and able to occasionally interact with supervisors, coworkers, and the public. (Tr. 212). VE Benoit opined this individual could perform the same jobs, and at the same numbers, as the first hypothetical individual. (*Id.*).

For the third hypothetical, the ALJ asked the VE to consider all of the same circumstances as the second hypothetical, except that this individual would be limited to the sedentary exertional level. (*Id.*). VE Benoit opined that this individual could work as an inspector, DOT 669.687-014, sedentary, SVP 2, with 17,000 jobs in the national economy; as a final assembler, DOT 713.687-018, sedentary, SVP 2, with 47,000 jobs in the national economy; and as a circuit board assembler, DOT 727.684-110, sedentary, SVP 2, with 27,000 jobs in the national economy. (Tr. 213).

For his next hypothetical the ALJ asked what impact it would have if each of hypotheticals one, two, or three were also to include a limitation to frequent handling or fingering with the right and left hands. (*Id.*). The VE opined that this would not change the outcome for any of the three hypotheticals. (*Id.*). If the ALJ added limitations that the individual is able to work in up to and including a loud noise environment, and have frequent exposure to extreme heat, the VE again opined that would not change her responses to any of the three hypotheticals. (*Id.*). The VE opined, however, that a limitation to never interact with coworkers

14

or the public would however be job preclusive. (Tr. 213-14). If the individuals would be off-task 20 percent of an 8-hour workday or absent for work more than twice monthly, in either case, the VE opined the limitation is work preclusive. (Tr. 214). Under questioning from Spradlin's attorney, VE Benoit opined that any breaks required beyond the normally provided one 30 minute break and two 15 minutes would also be work preclusive. (Tr. 214-15).

## IV.    The ALJ's Decision

In his decision dated September 5, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2.    The claimant has not engaged in substantial gainful activity since July 4, 2022, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: mild degenerative spondylosis of the lower lumbar spine; mild curve of the upper dorsal spine with convexity left and mid-dorsal spine with convexity to the right consistent with rotoscoliosis; mild degenerative changes of the cervical spine; migraines; obesity; depression and adjustment disorder; and anxiety (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: He can occasionally reach overhead with the right and the left upper extremity. He can frequently reach in all other directions with the right and the left upper extremity. He can occasionally climb ramps and stairs. He can never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. He can understand, remember, and carry out simple instructions. He can use his judgment to make simple work-related decisions. He cannot perform work requiring a specific production rate (i.e., assembly line work). He can deal with occasional changes in a routine work setting. He can occasionally interact with supoervisors, coworkers, and the public.

15

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 17, 1986 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 4, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-29).

## V. Law and Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

16

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.     Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.  Discussion

Spradlin raises a single issue for this Court's review, whether the ALJ failed to consider the medical opinion of Andrew Bonsky, PA-C, rendering the RFC unsupported by substantial evidence. Specifically, Spradlin argues that the ALJ erred in determining that PA Bonsky's entire opinion is reserved to the Commissioner, and thus failed to satisfy the articulation requirements of 20 C.F.R. § 404.1520(c)(2). (ECF Doc. 8, p. 10). In Spradlin's view, even if the ALJ was able to reject the portion of PA Bonsky's opinion that addresses his inability to "perform his work at home fulltime sedentary occupation," the ALJ was still required to address the other portions of the opinion that evaluate specific functional limitations. (*Id.* at p. 11). He contends this would include PA Bonsky's statements that Spradlin is incapable of meeting the

requirements associated with sedentary work, in addition to the handwritten statements concerning limitations relating to Spradlin's inability to hold his head up for periods exceeding one hour. (*Id.* at p. 12). By dismissing PA Bonsky's opinion without further discussion, Spradlin asserts that the ALJ denied a reviewing court the opportunity to trace his reasoning and properly assess its validity. (*Id.* at p. 13).

The Commissioner retorts that substantial evidence supports the ALJ's determination that PA Bonsky's opinion concerned an issue that was reserved to the Commissioner, and therefore, was inherently neither valuable nor persuasive. (ECF Doc. 9, p. 5). Accordingly, the ALJ did not err by failing to articulate the persuasiveness of the opinion. (*Id.*). Even if the ALJ were required to provide a more fulsome evaluation of PA Bonsky's opinion, the Commissioner argues he indirectly did so by evaluating the prior administrative medical findings ("PAMF's") and other evidence. (*Id.* at p. 6). The Commissioner argues that by explaining the basis for his sedentary RFC determination, the ALJ supported his decision with substantial evidence because "the procedural protections at the heart of the rule may be met when the supportability of a doctor's opinion, or its consistency with other evidence is indirectly attacked via an ALJ's analysis of a physician;s other opinions or his analysis of the claimant's ailments. (*Id.* at p. 7, citing *Curtis v. Comm'r of Soc. Sec. Admin.,* No. 3:22-cv-01317-DAC, 2023 WL 4187918, at *14 (N.D. Ohio May 15, 2023)). Further, by PA Bonsky's own statements, he was not making a medical determination on Spradlin's long term functionality. (*Id.* at p. 8). Finally, the Commissioner contends that PA Bonsky did not provide narrative discussion of Spradlin's impairments, symptoms, and/or examination findings, and it was therefore conclusory and provided no insight into his reasoning. (*Id.*).

19

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.*, 2022 WL 3445856, at *3.

In the present case, the ALJ addressed PA Bonsky's opinion by writing "the undersigned acknowledges a disability assessment by Hartford Insurance . . . the undersigned finds this

20

opinion is an issue reserved for the Commissioner, and it is neither inherently valuable nor persuasive (20 CFR 404.1527(e)(1)). (Tr. 26). The regulations establish that any "[s]tatements on issues reserved to the Commissioner," such as whether a person is or is not "disabled, . . . able to work, or able to perform regular or continuing work," are "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c)(3)(i). The ALJ is therefore not required to "provide any analysis about how [he] considered such evidence in his determination or decision." 20 C.F.R. § 404.1520b(c); *Walton v. Comm'r of Soc. Sec.*, No. 1:23-cv-1408, 2024 WL 3387300, at *21 (N.D. Ohio June 24, 2024). Where PA Bonsky checked boxes to indicate that Spradlin was incapable of performing his past job, and that no accommodations could be made to allow him to return to his past work, these were clearly the types of statements envisioned in the regulation cited above. PA Bonsky's opinion in that regard clearly invaded the province of the Commissioner in a manner that rendered those assessments inherently invaluable and unpersuasive, and the ALJ's articulation to that effect was appropriate.

Spradlin's contention that PA Bonsky's narrative explanation of his check box opinion demanded further evaluation by the ALJ is equally unavailing. PA Bonsky specifically wrote that it is "beyond my scope of practice to determine long-term disability," and referred the reader to specialist consultations for that purpose, while providing a recitation of symptoms and self-proclaimed limitations that Spradlin had described. (Tr. 918). Such a regurgitation of Spradlin's description of his own symptoms does not rise to the level of a "medical opinion." See *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F.Appx 802, 814 (6th Cir. 2011). Accordingly, the ALJ's articulation of how he evaluated PA Bonsky's response to request for medical information was satisfactory, and does not provide cause for remand.

21

## VII.    Recommendation

Because the ALJ applied proper legal standards when evaluating the opinion of PA Bonsky, I recommend affirming the Commissioner's final decision denying Spradlin's application for DIB.

Dated: May 5, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

22

specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)